# SUPREME COURT.

IN THE MATTER OF THE APPLICATION OF THE TAX PAYERS OF. THE TOWN OF GREENE FOR A WRIT OF CERTIORARI, &c.

Where a petition and application to a county judge, under the act of 1869, for the purpose of *bonding a town* for a certain sum, to aid in the construction of a railroad, purports to be signed by a majority of the tax payers of the town, whose names appeared on the last, preceding tax list or assessment roll of said town, in pursuance of the provisions of said act, no tax payer, thus consenting, by his signature, to the object of the application, after a knowledge of all the facts, can ever *withdraw such consent.*

*Supreme Court, Special Term, Chenango, Feb. 25th 1870.*

IN the matter of the application of the tax payers of the town of Greene, Chenango County, under chapter 907 of the Laws of 1869, to issue bonds in aid of the Greene Rail Road Company.

Motion for a writ of *certiorari* to review the proceedings of the county judge of Chenango county, authorizing the issuing of bonds by the town of Greene, to be invested in the Greene rail road company. The same came up on an order to show cause why such writ should not issue.

The facts appear in the opinion of the county judge as follows:

H. G. PRINDLE, *County Judge.*—This was an application to the county judge, on the part of the tax payers of the town of Greene, with a view of bonding the town for $198,700, to aid in the construction of the Greene rail road company, pursuant to chapter 907 of the Laws of 1869. The petition dated October, 1869, was presented to the county judge on the 8th day of November, 1869, and purported to contain a majority of the tax payers, whose names appeared on the last preceding tax list or assessment

roll of said town, as owning or representing a majority of the taxable property of said town, and was verified by five of the petitioners; an order was made for the publication of the notice of hearing as required by the first section of said act, which notice was duly published.

The hearing commenced on the 23d day of November, 1869, and consumed a week. A mass of testimony was given and a variety of questions were raised and disposed of, with the exception of the question as to the right of a petitioner to appear upon the hearing and withdraw from the petition or revoke his consent. It is conceded by the counsel of the respective parties, that if the petitioners have this right, this application must be denied, as a sufficient number of the persons who had signed the petition originally, appeared at different times during the hearing, claiming the right to revoke and withdraw their consent, to defeat the application, although a large number appeared on the hearing and were allowed to unite in the petition pursuant to the second section of said act. I shall therefore, confine myself mainly to the consideration of this question.

The law of 1869, under which these proceedings are instituted provides an entirely new method of ascertaining and determining whether the requisite number of tax payers have given their consent to bond a town in favor of protected rail roads and I am not aware of any adjudications under this statute. It was substantially conceded on the argument by the counsel for the contestants, that under the different acts heretofore passed by the legislature authorizing towns to bond in favor of rail roads, consents when once fairly obtained, could not be revoked. I do not find any reported case where the question has been distinctly settled; although Judge PORTER in delivering the opinion of the court in the case of the *People* agt. *Mitchell*, (35 *N. Y.*, 555,) says. "Such a submission was a ready and convenient form of taking a popular vote where the ballot would be inappropriate, as a mere numerical majority would

not suffice unless it represented also a majority interest in the assessment roll." The counsel for the petitioners, on the argument presented the manuscript opinion of justice GOULD, made in 1859, in the case of *Mann* agt *Westover and others*, under laws of 1866–7, in regard to bonding towns in aid of the Albany and Susquehanna rail road, in which the learned justice says: "I am further entirely unable to see that any person who had once signed his name to a written consent unconditionally, was by either law allowed to change his action or in any way retract it. The law presumed he would not write his consent unless he meant that *he consented*; and it made no provision for his changing his mind whether within one day or one year." I think the opinion of Justice GOULD has been conceded to be correct by the best legal minds in the state, and has been acquiesced in by the profession generally.

It is claimed by the counsel opposed to this application that the act under which these proceedings were instituted and the mode of determining the question, whether a majority of tax payers have consented to bonding or not, have so changed the law and the rights of petitioners, that conceding that under previous laws a person could not revoke his consent under the act in question he has that right. It becomes important to examine this law in order to determine whether there has been any change effected by it. The second section of said act provides: "It shall be the duty of said judge at the time and place named in the said notice to proceed to take proof as to the said allegations in said petition; and if it shall appear satisfactorily to him that the said petitioner or the said petitioners and such other tax payers of said town as may then and there appear before him, and express a desire to join as petitioners in said petition, do represent a majority of the tax payers of said municipial corporation, as shown by the last preceding tax list or assessment roll, and do represent a majority of the taxable property upon said list or roll, he shall so adjudge and

determine and cause the same to be entered of record. And such judgment and the record thereof shall have the same force and effect as other judgments and records in courts of record of this state."

Under previous laws allowing towns to bond in favor of rail roads, provision was made for ascertaining and proving whether the requisite number of tax payers had consented to bond *by affidavits,* and the proof was entirely *ex parte.* The parties interested had no opportunity of being heard or contesting the question as to whether the requisite majority had actually consented. In many instances the names of tax payers appeared as consenting, not in the hand writing of the party, and no opportunity was given to ascertain whether the signing was duly authorized or not. This led to confusion and litigation and a feeling of insecurity in regard to the validity of the bonds issued and in many instances prevented their sale, except at a ruinous discount. This had a tendency to defeat the objects of the law, and deprived the people of the benefits and advantages which they would otherwise have derived from giving aid to these public enterprises. The legislature undoubtedly intended by this act to remedy these evils, by giving all parties interested an opportunity to be heard, and the right to contest these questions before the county judge after due notice, and giving to his decision all the effect and authority of a judgment of a court of record. Has the right of a person to withdraw his consent when once fairly obtained, been effected by this act? This law simply changes the *mode* of ascertaining whether or not the requisite number of persons have given their consent to bond. I am unable to see how under this law a party has any better claim to revoke his consent than he had under previous acts. Most clearly, no authority is directly given by the law itself, and I think, none can be inferred from the language used or the nature of the proceedings. Satisfactory proof (which of course, means sufficient legal evidence,) that the persons whose

names purport to be signed to the petition, were signed by them or by their authority must be made, and if "*such petitioners*" and others uniting in the petition on the hearing, do represent a majority of the tax payers of said town as shown by the last preceding tax list or assessment roll, and do represent a majority of the taxable property upon such list or roll, the county judge is to adjudge and determine the fact, and cause the same to be entered of record and proceed to appoint commissioners. Upon such hearing if signatures to the petition were fraudulently obtained, and that fact was sufficiently established by the evidence, it would perhaps, be the duty of the county judge to exclude such names as petitioners in making up his determination and judgment; upon the principle that fraud vitiates all contracts. Yet, there may be room for argument as to this right if the signing of the petition is to be regarded in the same light as a vote by ballot. But where there is no fraud in the case, and a person freely and voluntarily gives his consent to bind the town, by deliberately signing his name to a petition clearly setting forth all the facts, I do not see upon any principle of law or equity why he should have the power of revocation or retraction. I think that nothing short of an express provision in the law itself, could upon any principle of reasoning, give him the right to thus nullify what he had done.

The signing of the petition is the same in principle as subscribing to the stock of a rail road, each petitioner in effect becomes interested as a stock holder, and it is well settled that subscribers for stock cannot withdraw their subscriptions when once made, even though they were made before the incorporation of the company. (*Lake Ontario, Auburn and New York R. R. Co.*, agt. *Mason*, 16 *N. Y.*, 451).

It would most clearly be unjust to the other petitioners to allow parties to withdraw upon the hearing, after the expense of instituting the proceedings before the county

judge had been incurred, relying upon their good faith, and believing that they intended by the act of deliberately signing the petition, what upon every principle of con struction, the law would hold as binding and conclusive upon them. The county judge might with the same propriety and be supported substantially by the same reasoning, allow petitioners to revoke and withdraw their consents after the determination before him, (and before any commissioners had been appointed or bonds issued,) if the act of signing has no binding force or effect. It would be most difficult to limit the exercise of this right when once it is conceded to exist.

The proceeding before the county judge, in case the petitioners had the right to withdraw their consent at any time before the hearing closed, would scarcely attain the dignity of a political caucus, as the vote when once deposited upon such occasions, cannot be withdrawn; but must be counted for one candidate or the other. If a petitioner has the right to have his name stricken from the petition at any time during the hearing, he would most clearly have the right to change his mind and sign again before the hearing closed, and thus have his name erased and reinstated as many times during the hearing as he might be convinced by the one party or the other of his error of action. It is very easy to discover how, in a town with a population as large as the town of Greene, with a large number of tax payers, honest men, who desire to do in the premises what would be for the interest of the town, but influenced in their judgment and action by the arguments and opinions of their fellow townsmen, might be thus operated upon by the friends and opponents of the project and be led honestly to change their minds in regard to the propriety of aiding the rail road; and success would be apt to attend the efforts of the party which was the most vigilant and fertile in their powers of persuasion, and thus the desire of success would be the most absorbing question, while the real interests of

the town, might be entirely lost sight of. It was undoubtedly the intention of the legislature to make provision for obtaining the sentiment of a majority of the persons in a town who must bear the burdens of taxation, and provisions have been made for obtaining a fair and honest expression of the tax payers, where the subject could be acted upon by each individual, coolly and deliberately, without the excitement usually attending the decision of such questions by ballot; and I think, such deliberate signing of a petition should be regarded as decisive as the ballot at least. Had the legislature provided that the question should be determined by ballot, it would hardly be contended that when the ballot was once deposited in the box it could be withdrawn even if it could be identified. Yet stronger reasons would probably exist for allowing a party to retract his action at the polls, where the ballot is deposited in the heat of a contest, than for allowing a name to be stricken from a petition placed there coolly and with deliberation.

It is claimed by counsel for contestants that the law gives the right to withdraw to a petitioner, inasmuch as other tax payers, not petitioners, have a right on the hearing to unite in the petition.

The object of allowing others to join, undoubtedly was, that all might have an opportunity to unite in the project after notice had been published calling their attention to the subject. Had it been the intention to allow petitioners to withdraw from the petition, as well as to allow other tax payers to unite in it, it cannot be doubted that a clause would have been inserted to that effect, as the provision allowing others to unite naturally leads the mind directly to that subject. The claim that petitioners may withdraw is based upon the fact that the law expressly authorizes others to unite; were it not for this fact, it would doubtless be conceded that no such right exists; yet how can it be said that the clause allowing tax payers to unite in the

petition, confers the right to withdraw when nothing is said or intimated upon the subject? The question is not what *ought* the law-makers to have done, but what *did* they do? Again it is claimed that this is a special proceeding and in court, instituted by petition, and as in the case of other special proceedings under the Code, a petitioner has a right, at any time before judgment to withdraw his petition.

I am unable to see how, in any manner, the county judge acts as a court or that this is a proceeding in court. The law simply provides, that the proofs shall be taken before the county judge, and the result when ascertained shall be entered of record, and such determination shall have the fore and effect of a judgment of a court of record. If this is a proceeding in court what court is it in? If it is in the supreme or county court, then the decision is the decision of a court of record, and there was no necessity on the part of the legislature to raise the decision of the county judge to the dignity of a judgment of a court of record, giving it equal force and effect. The fact that the legislature designated the county judge as the officer before whom the proof should be taken, does not make it a proceeding in court, neither does the fact that his determination is to have the force and effect of a judgment of a court of record.

The law might have designated the county clerk or any other person before whom such proof should be made, and have given equal force and effect to this decision, yet this would not in any manner, constitute it a case in court or a special proceeding under the Code. There are many proceedings under special statutes in which the legislature have made particular acts and determinations as effective and conclusive as the decisions of county judges under these proceedings, yet they would hardly be claimed to be decisions in court on that account. But whether this is a proceeding in court, or otherwise, it is clear that the county judge has no power, except what is conferred by the statute itself, and

he could not allow the petitioners to withdraw without violating the express provisions of the law which requires him to determine whether " said petitioners," not such of them as have not withdrawn and such other tax payers as may unite on the hearing, constitute a majority appearing upon the tax list or assessment roll.

On the hearing the contestants claimed the right to show that persons whose names appeared upon the assessment roll as owning property, did not in fact own the property, but occupied the same as tenants, and in some cases that wives were the real owners instead of their husbands to whom the property was assessed.

I think it was clearly the intention of the legislature to make the assessment roll the only basis for determining who are or are not tax payers in said town, and conclusive upon this question.

The county judge had no right to try the question of title to property, and thus contradict the assessment roll. If a persons name appeared upon the roll as the owner of property that fact was conclusive upon the question of ownership, and it was so held upon the hearing. The legislature had a right to say how this question should be determined—and having fixed upon the last preceding tax list or assessment roll as the test and confined the county judge on the hearing to the persons whose names appear thereon, as the owners of property, for the purposes of this proceeding, they must be regarded as the owners of the property. They are the tax payers referred to in the statute.

It was also claimed by the contestants, in regard to estates of deceased persons appearing upon the roll, that they had the right to show who were the heirs and next of kin entitled to the property, and that such persons should be counted as the owners of property on such roll, although their names did not appear thereon. I think this evidence was properly excluded.

If such is the case, it would be necessary to ascertain the amount of personal property belonging to such estates, the amount of debts, and whether it was necessary to sell the real estate to pay the debts, the amount each heir was entitled to, as not only the names—but the amount of property represented by each must be shown, and a variety of other points incident to the determination of these questions. I think it quite clear too, that if contestants can go behind the assessment roll, the other party can do the same and obtain signatures to the petition of property owners not on the roll.

If such a construction obtain it was idle to make any provision about the assessment roll. It is no guide in the proceedings, and issues are left to the county judge so numerous and difficult that their determination is wholly impracticable. It cannot be possible that the legislature intended such litigation upon the hearing, nor can I find any evidence of such intention in the law.

After giving the subject a careful consideration, I am satisfied that the petitioners, and the other tax payers who appeared before me on the hearing, and expressed a desire to join in the petition, do represent a majority of the tax payers of the town of Greene, as shown by the last preceding tax list or assessment roll, and do represent a majority of the taxable property upon said list or roll, and I must so adjudge and determine in accordance with the statute.

The judgment directed by the county judge was as follows:

In the matter of the application of the tax payers of the town of Greene, Chenango county, under chapter 907 of the laws of 1869, to issue the bonds of said town and invest the same, or the proceeds thereof, in the stock of the Greene rial road company.

Before H. G. PRINDLE, Chenango county Judge.

Whereas, on the 8th day of November, 1869, an applica-

tion was made to the county judge, of the county of
Chenango, by certain tax payers of the town of Greene, in
said county, purporting to be a majority of the tax payers
of said town, whose names appear upon the last preceding
tax list or assessment roll of said town, as owning or re-
presenting a majority of the taxable property in the cor-
porate limits of such town, by petition verified by five of
the petitioners, setting forth that they are a majority of the
tax payers of said town, and represent a majority of the tax-
able property of said town, and that they desire that such
town shall create and issue its bonds to the amount of one
hundred and ninety-eight thousand and seven hundred dollars,
and invest the same, or the proceeds thereof in the Greene
rail road company, (said rail road company being a com-
pany in this state,) and praying the said county judge to
take all and singular the proceedings requisite for the pur-
pose pursuant to the statute in such case made and provided.
Whereupon the said county judge, on said 8th day of
November, 1869, pursuant to the statute, duly made an
order that a notice should be forthwith published in the
" Chenango American," a newspaper published at Greene,
in the said county of Chenango, directed "to whom it may
concern," setting forth that on the 23d day of November,
1869, at ten o'clock in the forenoon of that day, at the office
of said county judge, in the village of Norwich, in said
county, the said county judge would proceed to take proof
of the facts set forth in said petition; as to the number of
tax payers joining in said petition, and as to the amount of
taxable property represented by them pursuant to chapter
907 of the laws of 1869, and directing that said proof be
taken in said matter at the time and place aforesaid. And
whereas, on the said 23d day of November, 1869, at ten
o'clock in the forenoon of that day, proof by affidavit having
been duly made to the said county judge of the publication
of said notice pursuant to said order, the parties interested
in said matter and proceedings appeared before said county

judge at his office aforesaid.    E. H. PRINDLE, Esq.,
appearing as counsel for said petitioners and in favor of said
application and NEWTON and TILLSON, Esqrs., appearing as
counsel for those opposed to said application, and on that
day, and the days to which said proceedings were duly
adjourned, made proofs and allegations before me of the facts
set forth in the said petition, as to the number of tax payers
joining in such petition, and as to the amount of taxable
property represented by them, as shown by the last pre-
ceding tax list or assessment roll of said town, and as to the
whole number of tax payers of said town, and the whole
amount of taxable property of said town, as shown by the
said last preceding tax list or assessment roll of said town,
and of all other facts necessary to be taken into considera-
tion relating thereto ; and other tax payers of said town of
Greene, then and there appeared before said county judge
and expressed a desire to join as petitioners in said petition,
and did so join as petitioners in said petition; and proof
being taken as to the number of tax payers so joining in
said petition, and as to the amount of taxable property
represented by them, as appearing upon the said tax list or
assessment roll, and after hearing the arguments of the
counsel aforesaid, it appearing satisfactorily to the said
county judge, that the said petitioners whose names appear
upon said tax list or assessment roll and the other tax payers
aforesaid of said town who did then and there, on such
proceedings, appear before him, and express a desire to join
as petitioners in said petition as aforesaid, and did so join,
and whose names also appear upon said tax list or assess-
ment roll; do represent a majority of the tax payers of said
town, as shown by the said last preceding tax list or assess-
ment roll (said tax list or assessment roll being the tax list
or assessment roll of the year 1869,) and do represent a
majority of the taxable property upon said list or roll, and
that the said amount of bonds named in such petition does
not exceed twenty per cent of the whole amount of taxable

property as shown by said tax list or assessment roll: It is hereby adjudged and determined by the said county judge, and the said county judge doth hereby adjudge and determine, in pursuance of the statute in such case made and provided, that the said petitioners whose names appear upon said tax list or assessment roll, and the other tax payers aforesaid of said town who did then and there on such proceedings appear before him and express a desire to join as petitioners in said petition as aforesaid, and did so join, and whose names also appear upon said tax list or assessment roll, do represent a majority of the tax payers of said town, as shown by the said last preceding tax list or assessment roll, (the same being the tax list or assessment roll of the year 1869,) and do represent a majority of the taxable property of said town, as shown by said last preceding tax list or assessment roll: And the said county judge hereby orders and directs that this judgment and determination be duly entered of record with the clerk of the county of Chenango.

In witness whereof the said county judge hath hereunto set his hand this 3d day of February, 1870.

H. G. PRINDLE, *Chenango County Judge.*

On this motion for a *certiorari,*

ISAAC S. NEWTON, *for the contestants*
E. H. PRINDLE and HENRY R. MYGATT, *for the commissioners, and the town of Greene.*

I. A railway is so far considered in the nature of an improved highway that the legislature may empower towns and counties to subscribe for stock in such companies whose road pass through such towns or counties. The policy of such legislation is in no degree a question for the court; that belongs exclusively to the people and their representatives.

Since the recent decisions in the court of appeals no court will question the authority of the legislature to enact laws enabling a town to subscribe for stock in a railroad, issue its bonds, or to raise money by tax or to pay for the same. (*Bank of Rome* agt. *Village of Rome*, 18 *N. Y.*, 38; *People* agt. *Mitchell*, 35 *N. Y.*, 551).

In *Thompson* agt. *Lee County*, the supreme court of the U. S., declared that the legislature of the state unless restrained by the organic law, has the right to authorize a municipal corporation to take stock in a railway or other work of internal improvement, and to borrow money to pay for it. (3 *Wallace*, 327).

In the case last cited from 35 N. Y., our court of appeals adopted the same rule, and in the exact terms, declared by the supreme court of the United Sates.

It has been claimed as unjust and opposed to the fundamental principles of the social compact, to authorize a majority to compel a minority to contribute to objects which they disapproved and opposed. The objection would lie with equal reason against every act of the legislature creating a public municipal corporation, in opposition to the will of any one who can be made subject to its action.

It is a fundamental principle of our institutions both sovereign and corporate that majorities must govern, that minorities must submit.

II. The tax payers who petitioned the county judge for the right to issue bonds for the railroad stock cannot withdraw their names and discharge themselves from liability. This point was decided as early as 1816 in the English Court of Exchequer, where it was held in *Kidwelly Canal Co.* agt. *Raby*, that one of several persons who subscribed to an agreement *inter se* to promote a joint undertaking or common purpose, cannot withdraw his name and discharge himself from the engagement, without the consent of the subscribers. (2 *Price*, 93).

In that case it appeared that the defendant was one of

the original subscribers to the first proposals of uniting for the purpose of effecting the objects of the company, and to the intended measure of obtaining an act of parliament as the foundation of the undertaking:—that he had signed his name to a paper purporting to be a list of subscribers to the plan in August, 1811.

That the act of parliament was obtained in June, 1812; that during the progress of the bill the defendant expressed his wish to withdraw his subscription, and desired that his name might not be inserted in the bill, and his name was not inserted in the bill.

The action was to recover calls from the defendant, when it was contended by his counsel that the defendant was at any time competent to abandon the project previous to the passing of the bill; that having declared himself no longer a subscriber before the committee of the house, he had become completely discharged.

THOMSON, *Ch'f Baron* said: "The form of this action has been rightly adopted, under the direction of the act. It was incumbent on the plaintiff to show that the defendant was a proprietor, and the question is, whether the evidence in fact does. It is said, that he became a proprietor by signing a paper, by which certain persons agree to unite for the purpose of carrying the undertaking into execution. An act of parliament to enable them to effectuate their intention was passed incorporating certain persons by name, as proprietors for carrying the undertaking into execution (among whom that of the defendant does not occur), together with such persons as shall hereafter be possessed of any shares in the undertaking. No doubt, the defendant was one of the parties agreeing to undertake the execution of the projected plan, and the act which was obtained proceeded on the footing of that agreement. It seems that while the bill was in progress the defendant objected to being longer considered as one of the subscribers and requested his name might be struck out.

" As to the defendant's withdrawing, on which so much stress has been laid, he could not discharge himself by any declaration to that effect, nor was the committee competent to consent to such withdrawing."

GRAHAM, *Baron.* " The main question is whether he was bound by his original subscription, and if so, whether he was subsequently released ? The agreement he subscribed was binding, nor can a man renounce by such means as Raby adopted. Nor did the omission of his name by the committee, discharge him, more than Lord CAWDOR and Lord DYNEVOR. There must for that purpose have been an explicit consent of the other adventurers."

WOOD, *Baron.* "The questions in this case are: 1st. Whether the defendant was an original subscriber to the undertaking intended to be carried into effect by that act; and 2dly. Whether, if he were so, he has discharged himself by what had been done ?—

" It is immaterial to ascertain whether the defendant voted in respect of his original subscription, or of his assigned shares. The heading of the instrument differs only in words, but not in substance, from the act. They are called subscribers in each.

" Then is he discharged from his subscription by what he has done ? Whenever there is an agreement between several, one party cannot withdraw without the consent of the others, as in the case of creditors having agreed to take composition, one cannot retract without the consent of all the rest. Here, it is admitted, there was no consent, and his declaration of abandoning amounts to nothing."

RICHARDS, *Baron.* " One of the necessary means for carrying into execution the plan, towards which the persons whose names appear to this paper have subscribed, was the procuring of an act of parliament. That was a necessary step, and must therefore be upheld. Raby was a subscriber to this paper and was bound by its terms to adopt every measure necessary to its execution. If Raby had not

endeavored to withdraw, there would have been no doubt of his liability; then the question becomes whether he has in fact withdrawn, and I think he has not, inasmuch as he could not do so, without the consent of all those with whom he had become engaged in the undertaking."

In Indiana, *The Wabash & Mount Vernon Plank Road Co.*, sued *E. S. & T. S. Johnson* upon an alleged subscription of stock and recovered.

On appeal—

PERKINS, J. " The company was organized under the general plank road law, some time after the Johnsons had subscribed and after numerous other persons had subscribed, but before the organization of the corporation; the Johnsons without the consent of the other subscribers, with a penknife, so defaced their subscription as to render it partly illegible, but not to such an extent but that it could, though with difficulty, be read, and they did this with the intention of withdrawing the subscription. The remaining subscribers subsequently effected a legal corporate organization, and that organization sues the Johnsons upon their mutilated subscription."

" The erasure of the subscription did not *per se* prevent a suit upon it. (*Ind. Dig.* §§ 86, 166 *pp.* 204, 216.) Explanatory parol evidence was admissible. (*Hatch* agt. *Dickinson*, 7 *Blackf.* 48.)

" The title of the act under which the company was organized, is " an act authorizing the construction of plank, McAdamized and gravel roads." Such roads in this state we know historically have almost uniformly been constructed by corporate associations; they have been the agents for the construction, and we think provisions furnishing legal and usual instrumentalities to accomplish a legal object may be properly connected with that object considered as a subject of legislation, (1 *R. S.* 394.) The main point in this case is whether the Johnsons could withdraw their subscription, the other subscribers not consenting, and we

think they could not. The point has been directly decided in *Lake Ontairio, &c., Railroad Company* agt. *Mason*, 16 *N. Y. Court of App.* 451. We follow that decision."

That decision arose upon a subscription of stock made before the incorporation of a railroad company, wherein it was held that the subscription was obligatory although no cash payment whatever was made, and that the right to membership is a sufficient consideration for the subscriber's liability, and he cannot revoke his subscription.

The opinion of the court of appeals by BROWN J., was as follows :

" The subscription of the defendant to the articles of association was in effect a contract to pay for and accept the twenty shares of stock. The advantages derived from being a member of such a company and of the consequent right to participate in the pecuniary dividends is a positive benefit, and where the agreement secures that advantage to the subscriber on the organization of the company, the objection of a want of consideration cannot be made with success." (*The Hamilton and Deanesville Plank Road Co.* agt. *Rice*, 7 *Barb. S. C. R.* 157 ; *Stanton* agt. *Wilson*, 2 *Hill* 153 ; *Barker* agt. *Bucklin*, 2 *Denio* 45 ; *The Schenectady and Saratoga Plank Road Co.*, agt. *Thatcher*, 1 *Kern.* 102; *Barnes* agt. *Perine*, 2 *id.* 18.) If the contract to pay for and take the stock was a valid contract made upon a sufficient consideration, then his subscription was not open to revocation. Until the incorporation of the company was perfected the other subscribers had an interest in its execution, and performance of which they could not be deprived by the act of the defendant."

In the case of *Mason* agt. *Westover and others*, and another case before Mr. Justice GOULD, in 1859, the question now to be determined was then adjudged, where the court had unadvisedly issued an injunction, the court said :

" I am further entirely unable to see that any person who had once signed his name to a written consent, uncondition-

ally, was by either law allowed to change his action or in any way retract it. The law presumed he would not write his consent unless he meant that *he consented*, and it made no provision for his changing his mind, whether within one day or one year.

I am constrained to say that I granted these injunctions unadvisedly, without having, in the then pressing emergency, time for examining the cases, and that they must be dissolved."

The court of appeals in the recent case of *The People* agt. *Mitchell* (35 *N. Y.* 555) opinon by PORTER J., regarded the consent of the tax-payers to the subscription for stock and the issue of town bonds to aid a public enterprize in which the subscribers were deeply concerned, and in which the community in which they resided were interested, as " *a ready and convenient form of taking a popular vote.*"

In Connecticut in the supreme court of errors, in the *Society for Savings* agt. *City of New London*, (20 *Conn.* 174,) where bonds were issued by a city to be loaned to a railroad company, it was held that the acquiescence of the city of New London in voting to issue the bonds was a valid act, and could not be repudiated. The court by ELLSWORTH, J. say:

" We must believe that after such acquiescence it would be an outrage upon morality and justice, and an impeachment of the integrity of the citizens of New London, to allow the city to repudiate its obligations. Many of the citizens we well know disapprove of and condemn such a repudiation, and we trust all of them would do so were it a simple transaction between man and man, where the culpability could not be thrown off upon a municipal corporation. But it is this very circumstance which enhances the impropriety of the act of repudiation, for the integrity of a public body is its principle virtue. To violate or impair this, is to undermine government itself, and to destroy the very institutions of the civil state. Such repudiation cannot receive the countenance of this court of justice."

The constitution of the United States was regarded as a new experiment in the history of nations. Its framers made use of the best lights to form and adjust its parts and mould its materials, and if they could not pronounce it perfect, they provided for amendments, providing that two thirds of congress or of the legislatures of the states, concur in proposing or requiring amendments to be proposed, and three fourths of the states must ratify them. Several amendments have been proposed and adopted. Whenever a state votes by its legislature for an amendment, that amendment to use the word of the constitution is *ratified* by the legislature, and when so confirmed, the vote can never be withdrawn. Story in his commentaries on the constitution, vol., 3 § 1824, says: "Time is thus allowed and ample time for deliberation both in proposing and ratifying amendments. Indeed, years may elapse before a deliberate judgment may be passed upon them."

It would therefore seem that whenever a vote is cast by an individual, municipality, or a legislature, by ballot, resolution or petition, that vote is irrevocable.

III. The county judge had jurisdiction of the subject matter, and his judgment determining the qustion at issue, has, by the act itself the same force and effect as other judgments in courts of record. The county judge was fit and competent to determine, and did determine that a majority of the tax payers of the last assessment list, representing a majority of the taxable property, did petition for the bonding of the town. Jurisdiction of the subject matter on the part of the county judge was made to depend npon the petition, and the petitioners finally appearing before him. The county judge gave many days of patient attention and labor, to determine the question presented for his decision, and his able and well considered opinion proved that he was a wise depository of the trust confided to him. In that judgment there should be perfect acquiescence.

IV. Any further litigation of this question would be worse than useless. The *certiorari* therefore should not be allowed. In the case of *Brown and Fitch* agt. *Wesson and Wesson*, (1 *How. Sp. Term*, 141,) a *certiorari* was allowed upon a mistaken statement of the facts. On motion to quash the same, founded upon affidavits which stated the real facts, the court by BRONSON, C. J., granted the same, saying it would be worse than useless to go on with the litigation."

*By the court*, BOARDMAN, J.—Upon the hearing of this matter upon the return of the order to show cause why a writ of *certiorari* should not issue to the county judge of Chenango county, to bring up proceedings had before him in determining whether a majority of the tax payers, and of the taxable property of said town had consented to the issuing of said bonds, the writ of *certiorari* is denied.

This denial is based upon the admitted fact that such majorities had consented prior to the adjudication of said county judge, if I should hold that a consent once given could not be withdrawn. The authorities are too clear to leave a doubt in my mind, that such consent, once given, with knowledge of the facts, cannot be withdrawn at the mere will of the person giving his consent. The motion is therefore denied without costs.